UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 1:08-cr-413 |
| | : | |
| v. | : | (Judge Rambo) |
| | : | |
| JOHN A. IORIO, | : | (Electronically Filed) |
| | : | |
| Defendant | : | |

UNITED STATES' BRIEF IN
OPPOSITION TO MOTION TO REDUCE
SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant John Iorio has filed a motion asking the Court to
reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A)
and order his immediate release, relying on the threat posed by the
COVID-19 pandemic. The Government respectfully opposes the motion.
The Court should deny the motion because Iorio has been convicted of
serious sex offenses and would present a danger to the public if
released. He should serve the remainder of his 240-month sentence.

**BACKGROUND**

Iorio was convicted of charges relating to child pornography and
enticement of a minor.  On June 19, 2009, the Court sentenced him to a
term of imprisonment of 240 months.  Doc. 27.  He has served roughly

148 months of this sentence, leaving him with a balance of more than seven and a half years.  The Bureau of Prisons estimates that his projected release date is March 7, 2025, assuming he earns all available good-time credit.  Iorio is incarcerated at the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury").  As noted below, that institution currently reports that his has no inmates or staff members with positive COVID-19 diagnoses.

## I.     BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module

1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol

is lengthy and detailed, establishing a multi-phase framework requiring

BOP facilities to begin preparations when there is first a "[s]uspected

human outbreak overseas." *Id.* at i. The plan addresses social

distancing, hygienic and cleaning protocols, and the quarantining and

treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential

coronavirus transmissions in January. At that time, the agency

established a working group to develop policies in consultation with

subject matter experts in the Centers for Disease Control, including by

reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in

accordance with its Coronavirus (COVID-19) Action Plan ("Action

Plan"), to minimize the risk of COVID-19 transmission into and inside

its facilities. Since that time, as events require, BOP has repeatedly

revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Eight of the

Action Plan. The current modified operations plan permits only limited

3

gathering within BOP institutions, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has significantly limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and are strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit

4

or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds

6

that emergency conditions will materially affect the functioning of BOP.

Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at

18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the

Director of BOP the authority to exercise this discretion, beginning at

the facilities that thus far have seen the greatest incidence of

coronavirus transmission. As of this filing, BOP has transferred 6,852

inmates to home confinement since March 26, 2020. *See* Federal Bureau

of Prisons, *COVID-19 Home Confinement Information*, *at*

https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate

sharply the risks of COVID-19 transmission in a BOP institution. BOP

has pledged to continue monitoring the pandemic and to adjust its

practices as necessary to maintain the safety of prison staff and inmates

while also fulfilling its mandate of incarcerating all persons sentenced

or detained based on judicial orders.

In addition to all of these measures, the independent Inspector

General of the Department of Justice will continue to engage in

inspections of the BOP facilities to assure compliance with necessary

steps. Further details and updates of BOP's modified operations are

available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

On Thursday, June 25, the CDC provided updated guidance and identified certain health conditions that create increased risk of an individual having a severe reaction if they contract COVID-19. DOJ's position has been that these specific health conditions present "extraordinary and compelling reason[s]" that may warrant compassionate release under section 3582(c)(1)(A)(i) and Application Note 1(A)(ii)(I) to U.S.S.G. § 1B1.13. For the court's convenience the revised CDC page can be found here.

Of note, the CDC has removed the age threshold, which used to be 65, and now states that anyone at any age with a specified condition may be at greater risk. The new list definitively states that people with specified conditions are at increased risk of severe illness from COVID-19. The CDC statement says that these designations are based on "consistent evidence from multiple small studies or a strong association from a large study that specific conditions increase a person's risk of severe COVID-19 illness." All of these conditions previously appeared as risk factors, with one notable change that broadens the population of

people at risk: obesity now qualifies with a BMI of 30, significantly

lower than 40 as previously stated. Here is the full list:

- Chronic kidney disease
- COPD (chronic obstructive pulmonary disease)
- Immunocompromised state (weakened immune system) from solid organ transplant
- Obesity (body mass index [BMI] of 30 or higher)
- Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies
- Sickle cell disease
- Type 2 diabetes mellitus

There is now a separate list of conditions that "might" increase

the risk of severe illness from COVID-19. The notable additions here,

which were not previously risk factors, include "hypertension or high

blood pressure," "neurologic conditions, such as dementia," and

"smoking." Other conditions on this list previously appeared as risk

factors, but now appear in this separate list of factors that *might* lead to

an increased risk for severe illness, including:

- Asthma (moderate-to-severe)
- Cerebrovascular disease (affects blood vessels and blood supply to the brain)
- Cystic fibrosis
- Hypertension or high blood pressure
- Immunocompromised state (weakened immune system) from blood or bone marrow transplant,

immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines
- Neurologic conditions, such as dementia
- Liver disease
- Pregnancy
- Pulmonary fibrosis (having damaged or scarred lung tissues)
- Smoking
- Thalassemia (a type of blood disorder)
- Type 1 diabetes mellitus

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by

10

released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.    Iorio's Request for a Sentence Reduction

Iorio is incarcerated at FCI Danbury. As of the filing of this brief, FCI Danbury reports that that the institution has zero positive COVID-19 cases among the inmate and staff populations.  BOP has reported that one inmate in its custody at FCI Danbury died after contracting the virus, whereas 92 inmates and 61 staff members have recovered. Federal Bureau of Prisons, *COVID-19 Cases*, *at* https://www.bop.gov/coronavirus/.

Iorio submitted a compassionate-release request to the warden which was denied on May 22, 2020.  Doc. 37, Ex. B.  On May 21, 2020 – before the warden had made a decision on Iorio's administrative request – Iorio filed a *pro se* motion for release from custody.  Doc. 34.  On May 26, 2020, the Court appointed the Federal Public Defender to represent the defendant in pursuing his motion.  Doc. 35.  On June 29, 2020, the defendant filed the counseled motion for compassionate release that is

pending before the Court, arguing that the defendant's medical diagnoses of "esophageal reflux, hyperlipidemia, and a disorder of the urinary system, as well as an enlarged prostrate [sic] with lower urinary tract symptoms" combined with the threat from COVID-19 warrant the Court reducing his sentence to time served.  Doc. 37 at 2.

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), a court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that

12

(i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction"; (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and

─────────────────

that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## ARGUMENT

In the Government's view, Iorio has satisfied 18 U.S.C. § 3582(c)(1)(A)'s exhaustion requirement because he submitted a request to the warden and at least 30 days have passed since the warden's receipt of that request. The Government will thus proceed on the assumption that Iorio's counseled motion is exhausted.

The Court should deny the defendant's motion with prejudice on either of two independently sufficient grounds. First, Iorio has not established that "extraordinary and compelling reasons" support a sentence reduction; second, Iorio has not met his burden to show that a reduction is warranted in light of the danger that he would pose to the community or that the relevant § 3553(a) factors support a reduction.

## A. Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c) (1) (A) (i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1 (A) and (C).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition or family circumstances, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the

16

ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover". USSG 1B1.13, cmt. n.1 (A). If a defendant's medical condition does not fall within one of the categories specified in the application note and no other part of the application note applies, his or her motion must be denied.

Here, Iorio makes the unsubstantiated claim that he suffers from medical conditions which place him in greater danger of having a serious adverse reaction if he were to contract COVID-19.  In fact, review of Iorio's medical records reveals that he has not been diagnosed with any of the definitive risk factors that the CDC identified in its updated guidance from June 25, 2020.  Instead he has identified esophageal reflux, hyperlipidemia, a disorder of his urinary system, and an enlarged prostate.  Doc. 37, Ex. A. Quite simply, Iorio is attempting to claim, without medical support, that his current conditions increase his risk of suffering a severe reaction should he contract COVID-19. Yet Iorio points to no guidance from the CDC – or any other credible medical authority – to substantiate this claim.

17

Moreover, while the CDC's June 25, 2020 revised list of risk factors mentions a number of conditions that "might" increase risk to an individual diagnosed with COVID-19, the only one of these factors that Iorio evidently has is elevated blood pressure, yet his readings vary widely from 132/82 on November 22, 2019, to 138/89 on April 9, 2020, to what appears to be an outlier of 172/72 that "reduced after a few minutes" on April 17, 2020. Doc. 37, Ex. A at 5, 17, 19. It appears that the defendant has been prescribed medication to control his elevated blood pressure, and his medical records are otherwise unremarkable with respect to this issue. Indeed, on May 11, 2020, a medical note indicates that Iorio does not have hypertension, but instead appears to have been prescribed medication to address some elevated blood pressure readings. Doc. 37, Ex. A at 22. His blood pressure on May 15, 2020, was recorded at 128/86.

He attempts to bolster his medical claims by asserting that he has had family members who have suffered from cardiovascular disease, but he himself does not appear to ail from it and his medical records in fact indicate that as recently as May 15, 2020, medical providers found that

18

his cardiovascular "rate and rhythm" were normal.  Doc. 37, Ex. A at 24.

In sum, the scant 28 pages of medical records that Iorio offers for his claim that he suffers from conditions that place him a grave risk of death is unpersuasive. He points to no condition that he suffers from that is on the CDC's list of definitive risk factors, his blood pressure appears to be managed, and his other conditions appear to be offered in an attempt to persuade the Court to conclude – without any scientific or medical support – that they increase his risk of having a severe reaction to COVID-19 should he become infected.  There is no basis for the Court to make this unsupported conclusion.

In the absence of evidence, Iorio is expressing a generalized and, understandable, fear of contracting the virus.  Yet, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The categories of risk factors encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility

19

that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), *as revised* (Apr. 8, 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of  e the Sentencing Commission as required by § 3582(c)(1)(A).").[2] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP

---

[2] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

employs to determine individual inmates' eligibility for sentence

reductions and home confinement. Section 3582(c)(1)(A) contemplates

sentence reductions for specific individuals, not the widespread

prophylactic release of inmates and the modification of lawfully imposed

sentences to deal with a world-wide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a

court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a

chronic medical condition that has been identified by the CDC as

elevating the inmate's risk of becoming seriously ill from COVID-19,[3]

that condition may satisfy the standard of "extraordinary and

compelling reasons." Under these circumstances, a chronic condition

(*i.e.*, one "from which [the defendant] is not expected to recover")

reasonably may be found to be "serious" and to "substantially diminish

the ability of the defendant to provide self-care within the environment

of a correctional facility," even if that condition would not have

constituted an "extraordinary and compelling reason" absent the risk of

---

[3] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

COVID-19. USSG § 1B1.13, cmt. n.1 (A) (ii) (I). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution. Yet, Iorio has not offered the Court any indication of what his release plan would look like, including where he would live, who he would live and associate with, what he would do to support himself, or where he would obtain medical care if needed. All of these factors are relevant to the Court's assessment of Iorio's alleged risk – and Iorio has entirely ignored these factors. Instead, he has rested upon his own idiosyncratic and unsupported contention that the medical conditions he does have increase his risk of suffering from COVID-19. Yet the medical evidence, when read against the CDC's guidance, simply does not support this argument.

In this case, the prison determined that Iorio's medical condition did not warrant his request for compassionate release. Iorio has failed to establish he has a medical condition let alone one that would qualify

as an "extraordinary and compelling reason" for a sentence reduction under § 3582(c). The motion should be denied on this basis alone.

## B. Iorio Still Poses a Significant Danger to the Safety of the Community and the § 3553(A) Factors Strongly Weigh Against His Release.

Alternatively, should the court find the evidence sufficient to show that Iorio has a medical condition or a combination of conditions that fits the CDC's list and therefore establishes an extraordinary and compelling reason for a sentence reduction, Iorio's motion should nonetheless be denied because he has failed to demonstrate that he is not a danger the community or otherwise merits release under the § 3553(a) factors.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13 (2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c) (1) (A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The defendant's criminal conduct in this case provides ample reason to be concerned that Iorio would be a danger to the community if

23

he were to be released. Iorio was convicted of serious sex offenses, including the receipt and distribution of child pornography and enticement of a minor. Review of Iorio's 46-page PSR highlights the risk this defendant poses to the public, and rightly informed the Court's decision to accept the parties' agreed-upon 240-month sentence that was made part of a plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

The information contained in the PSR indicates that Iorio had a predilection for child pornography and young victims in particular. The information contained in the PSR regarding the offense conduct, and related relevant conduct, is extremely disturbing and indicates repeated efforts of the part of the defendant to gain access to underage victims and to child pornography. The PSR also includes victim-impact statements from individuals who were victimized by the defendant's misconduct, including the distribution of images depicting their abuse. Those victims' interests in seeing the defendant held accountable for his actions – namely, to serve out the sentence that he agreed to as part of his plea agreement – should not be overlooked. Nothing in Iorio's brief

or the exhibits he has attached for the Court's review provide good grounds to conclude that Iorio is no longer a danger to the public

In deciding whether to grant Iorio's request, the Court must also consider all pertinent circumstances, including the 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A). Those factors weigh against his release.

As explained, the facts underlying Iorio's offense as well as his risks for reoffending based upon his past patterns of misconduct do not support his request for immediate release. Release of the defendant at this time would also mean that he would have served substantially less than the sentence the parties agreed to as part of his plea agreement, and that similarly situated offenders are required to serve upon conviction for the same offenses.

Additionally, Iorio's institution is engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19. Iorio provides no credible information that would allow the Court to conclude that he would be at relatively less risk if released from BOP custody.  He has not provided the Court even a suggestion for where he would go upon release, or where he would live, who he might live with, what he would

do to support himself, or where he would obtain medical care. There is simply no basis for the Court to conclude that Iorio would be at any less risk were he to be released than he is right now – housed at an institution with zero positive cases of COVID-19 among the inmate population.

## CONCLUSION

In light of Iorio's offenses and the totality of relevant circumstances, the Court should deny his motion for a sentence reduction.[4]

Dated:  July 13, 2020         Respectfully submitted,

                              DAVID J. FREED
                              United States Attorney

                              /s/ Christian T. Haugsby
                              Christian T. Haugsby
                              Assistant U.S. Attorney
                              PA 205383
                              228 Walnut Street, Suite 220
                              Harrisburg, PA  17108
                              Tel:  (717) 221-4482
                              Fax: (717) 221-4493
                              christian.haugsby@usdoj.gov

_____

[4] If the Court elects to grant Iorio's motion, then the Government requests that the Court accommodate the need to quarantine Iorio for a period of at least 14 days in order to protect public health. The Government requests that the Court retain jurisdiction over the motion for 14 days if it makes a determination to grant release, while advising the parties of that decision. BOP will then place Iorio in quarantine. If Iorio has not displayed symptoms or tested positive for COVID-19 for a period of 14 days, the Court can then order release. If Iorio tests positive during the initial 14-day period, the Government will notify the Court and seek an extension of the release date until Iorio has displayed no symptoms for a period of 14 days.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 9, 2020, I caused the within brief to be served upon the defendant's counsel by email and by filing the brief through the Court's ECF system.


<u>/s/ Christian T. Haugsby</u>
Christian T. Haugsby
Assistant U.S. Attorney